```
         IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF PUERTO RICO
```

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>**Plaintiff**,<br><br>         v.<br><br>KATERIN MARTÍNEZ-ALBERTO [3],<br><br>**Defendant**. | **Criminal No.** 18-066 (FAB) |

**OPINION AND ORDER**

BESOSA, District Judge.

Defendant Katerin Martínez-Alberto ("Martínez") moves for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 ("Rule 29"). (Docket No. 442.) For the reasons set forth below, the Court **DENIES** Martínez's Rule 29 motion.

**I.   Background**

In 2017, Martínez, Maximiliano Figaro-Benjamín ("Maximiliano"), Emiliano Figaro-Benjamín ("Emiliano"), and Alexandria Andino-Rodríguez ("Andino") (collectively, "defendants") conspired to import cocaine from the U.S. Virgin Islands to Puerto Rico. This conspiracy concluded on January 27, 2018, when United States Customs and Border Protection ("CBP") agents arrested the defendants and seized 55 kilograms of cocaine from their vessel, the "Black Wolfpack." (Docket No. 384 at p. 56.)

Criminal No. 18-066 [3] (FAB)                                              2

A grand jury returned a two-count second superseding indictment on August 14, 2019, charging the defendants with conspiracy to possess with intent to distribute at least five kilograms of cocaine in violation of 21 U.S.C. sections 846, 841(a)(1) and 841(b)(1)(A) (count one), and conspiracy to import a controlled substance into the United States in violation of 21 U.S.C. sections 952(a), 960(a)(1) and (b)(1)(B) (count two). (Docket No. 316.)[1]

Martínez and Andino stood trial in September of 2019. (Docket Nos. 367, 370, 372, 379, 391, 393 and 399.) The jury found them guilty on both counts. (Docket Nos. 402 and 403.) Martínez moved for a judgment of acquittal, and the United States responded. (Docket Nos. 442 and 505.)[2] The facts are set forth in the light most favorable to the jury's verdict and in a manner consistent with the trial record. United States v. Valerio, 676 F.3d 237, 240 (1st Cir. 2012); United States v. Polanco, 634 F.3d 39, 40 (1st Cir. 2011).

---

[1] On February 1, 2018, the grand jury initially charged Maximiliano, Emiliano, Martínez, and Andino with conspiring to import and distribute cocaine. (Docket No. 8.) The superseding indictment named two additional defendants, Bernardo Coplin-Benjamín ("Coplin") and José Resto-Miranda ("Resto"). (Docket No. 123.) Coplin and Resto pled guilty on August 5, 2019 and August 12, 2019, respectively. (Docket Nos. 277 and 299). Maximiliano and Emiliano pled guilty on August 18, 2019. (Docket No. 363.)

[2] Andino did not move for a judgment of acquittal.

Criminal No. 18-066 [3] (FAB)                                          3

### A. The Conspiracy to Import and Distribute Cocaine

The drug conspiracy commenced in 2017. (Docket No. 386 at p. 178.) Coplin "had the idea" of acquiring "a vessel to buy drugs in St. Thomas [to] bring them to Puerto Rico." Id. at p. 177. Resto purchased a yawl with funds provided by Coplin. Id. at p. 179. Law enforcement officers seized this vessel in connection with an unrelated investigation, however, impeding the criminal venture. Id. at p. 180.

Undeterred, Coplin proposed that the defendants transport cocaine on his personal vessel, the "Wasikoki." (Docket No. 386.) Resto, Coplin, and Andino visited St. Thomas in April of 2017 to "learn the route, to see how much would be spent in fuel [and] how long [the trip from Puerto Rico] would take." Id. at p. 183. During this time, the defendants and Resto socialized and sailed on the Wasikoki "as a group." Id. at p. 186.

Resto recruited Martínez to join the conspiracy, disclosing "what [the defendants] wanted to do, and that [they] needed women to come in and be like fillers." Id. at p. 188. According to Resto, "if anything happened along the way, if [they] were stopped or anything, [he] would assume responsibility [for the cocaine]." Id. at p. 188. Resto offered Andino and Martínez $3,000 each if "the trip was successful." Id. at p. 189. Andino and Martínez accepted his offer. Id.

Criminal No. 18-066 [3] (FAB)                                                4

### 1. The June 2017 Trip to St. Thomas

Maximiliano, Resto, Andino, and Martínez traveled from Puerto Rico to the Virgin Islands in June of 2017. Id. at p. 190. Andino and Martínez harbored no doubt about the purpose of this trip: Resto explicitly informed them that the "they were going to . . . St. Thomas to pick up cocaine and bring it back to Puerto Rico." Id. at p. 191.

The defendants arrived at the Crown Bay Marina aboard the Wasikoki, disembarked, and paid for two rooms at a local hotel. Id. at pp. 192-193. Maximiliano met with a "contact," returning to the hotel with ten kilograms of cocaine shortly thereafter. Id. The cocaine arrived in vacuum-sealed plastic bags with an external coating of grease to minimize the odor of acetone, a preemptive measure to avoid detection by law enforcement. (Docket No. 387 at pp. 20, 23 and 51.)

At approximately 7:00 AM the next day, Maximiliano and Resto secured the cocaine in a compartment adjacent to the engines. Id. at p. 21. The steering wheel of the Waskikoki malfunctioned, prompting the defendants to return to Puerto Rico without the cocaine. Id. at p. 25. Resto feared that "if the vessel broke down in the middle of the [ocean] . . . then the risk would be that [the mechanic] would check the vessel." Id. Andino

and Martínez received no compensation, but Coplin paid Resto $1,500 "for having made the trip." Id. at p. 27.

### 2. The Summer 2017 Trip to St. Thomas

Coplin provided Resto $30,000 to purchase the "Black Wolfpack," a 28-foot vessel with a cabin and two engines. Id. at pp. 28-30. Resto registered the vessel in his name and charged a fee for assuming that additional risk. Id. at p. 30. Maximiliano retrofitted the Black Wolfpack to accommodate and conceal large quantities of cocaine. Id. at p. 55-58. He removed the cabin table, carving a hole in the floor "so that there would be enough space for [an] entire kilogram to fit." Id. at pp. 55-58. The defendants then reattached the table, obscuring the hole and hidden compartment below the cabin.

In July or August of 2017, Resto, Maximiliano and Andino sailed from Puerto Rico to St. Thomas "to pick up between 45 and 60 kilograms [of cocaine]." Id. at p. 34. Coplin supplied petty cash for food and other incidentals. Id. Again, Maximiliano met with a contact after arriving at the Crown Bay Marina. Id. at p. 37. Resto and Andino subsequently joined Maximiliano at an apartment belonging to a woman referred to as "La Grandota." Id. at p. 41. Maximiliano, Resto and Andino prepared 45 to 60 kilograms "from scratch" by "cleaning them, removing the plastic that they came in . . . vacuum sealing them, and then putting the

Criminal No. 18-066 [3] (FAB)                                                          6

grease on them." Id. at p. 43.  The kilograms of cocaine displayed distinct insignia, such as crowns and Mercedes Benz symbols.  Id. at p. 44.

Before the packaging process concluded, Maximiliano's contact requested that the defendants transport an additional 20 to 25 kilograms of cocaine.  Id. at pp. 53—54.  They agreed.  Id.  Maximiliano and Resto then transported the cocaine from La Grandota's apartment to the Black Wolfpack at the Crown Bay Marina.  Id. at p. 56.

Because not all the cocaine fit in the hidden compartment, Resto and Maximiliano concealed the remaining kilograms near the water pumps and engines.  Id.  Andino then joined Maximiliano and Resto on the vessel, returning to Puerto Rico with 65 to 80 kilograms of cocaine.  Id. at pp. 61—62.  Resto and Andino earned $35,000 and $7,000, respectively.  Id. at p. 65.

### 3. The September 2017 Trip to St. Thomas

Resto, his wife Luisa, Andino, and Maximiliano returned to St. Thomas in September of 2017, days after Hurricane Irma devastated the Virgin Islands.  (Docket No. 387 at p. 79.)  They traveled with supplies to assume the appearance of relief workers, an attempt to disguise the illicit purpose of their trip. Id. at p. 77.  Resto, Luisa, Andino, and Maximiliano discovered that "there was no electricity" at the Crown Bay Marina,

"[complicating] the operation." Id. at p. 78. They ultimately reconvened at La Grandota's apartment to package the 60 kilograms of cocaine in vacuum-sealed plastic bags. Id. at pp. 82—83. The next day, Resto, Luisa, Maximiliano and Andino returned to Puerto Rico with the cocaine. Id. at p. 86. Coplin paid Resto and Maximiliano $20,000 each. Id. at p. 91. Andino received $7,000 for her participation. Id. at pp. 81 and 91.

### 4. The November 4, 2017 Trip St. Thomas

Martínez, Andino and Maximiliano traveled to St. Thomas o November 4, 2017. On day before the trip, Martínez and Andino discussed their plans. (Gov't Exhibit 90-1.).) This conversation included the following exchange:

> **Andino**: Mami we are leaving tomorrow early Get ready
>
> **Martínez**: Ok Were [*sic*] ready
>
> **Andino**: Okk
>
> **Martínez**: Hahaha

Id. A photo from Maximiliano's phone shows Martínez and Andino on the Black Wolfpack on November 4, 2017. (Gov't Exhibits 22 and 111.) Hours later, Martínez's phone captured a photo of cocaine on the floor of La Grandota's apartment. (Gov't Exhibit 88-1.) Registration documents signed by Andino demonstrate that the Black Wolfpack arrived and departed Crown Bay Marina on November 4, 2017.

Criminal No. 18-066 [3] (FAB)                                         8

(Gov't Exhibit 16.)  On November 6, 2017, Martínez forwarded a news article to Andino entitled "Two Women Arrested with 14 Kilos of Cocaine."  (Gov't Exhibit 90-1.)

### 5. The November 19, 2017 Trip to St. Thomas

The defendants made a second trip to St. Thomas within the same month.  Andino registered the Black Wolfpack at the Crown Bay Marina, arriving on November 19, 2017 and departing on November 21, 2017.  (Gov't Exhibit 16.) A photo taken on Maximiliano's phone on November 19, 2017 shows himself, Martínez and Andino at La Grandota's apartment with an ice-cooler in the background.  (Docket No. 387 at p. 42.)

### 6. The January 27, 2018 Trip to St. Thomas

On January 27, 2018, CBP agent Michael Moreau ("Moreau") received an order from his supervisor "to be on the lookout for a Puerto Rico registered vessel" named "Black Wolfpack."  (Docket No. 383 at pp. 111-113.)  Moreau located the Black Wolfpack at the Crown Bay Marina, observing two men and two women board the vessel with ice-coolers and a cardboard box.  Id. at pp. 117-119.  Although the "winds were probably about 15 knots," the Black Wolfpack departed from the marina and sailed westward toward Puerto Rico.  Id. at p. 121.

Based on Moreau's observations, CBP agent Daniel White ("White") prepared an interdiction vessel.  (Docket No. 384

at p. 9.)  White testified that "it was one of the roughest days that [he'd] been on the water," with "extremely violent" 15-foot waves.  Id. at pp. 11-12.  CBP agents located the Black Wolfpack at sea, requesting that the vessel return to St. Thomas.  Id. at p. 14.  White and his colleagues escorted the Black Wolfpack to a "secluded cruise ship dock . . . next to the Crown Bay Marina."  Id. at p. 19.  Maximiliano, Emiliano, Andino, and Martinez exited the vessel.  (Docket No. 383 at p. 145.)

      A Homeland Security Investigation ("HSI") agent and narcotic-detecting canine conducted an initial search of the Black Wolfpack.  Id.  The canine "had negative hits on the vessel," but "was very skittish."  Id.  Subsequently, CBP agents searched the vessel.  Id. at p. 146.  Moreau unscrewed a vent "and noticed a whole separate compartment" with "another compartment inside."  Id. a p. 147.  This second compartment contained 55 packages of cocaine covered with "motor oil or transmission fluid."  Id.  HSI agents arrested the defendants and seized their cellular phones.  Id. at p. 148.

      On January 29, 2018, Federal Bureau of Investigation ("FBI") agent Christopher Forvour ("Forvour") oversaw a secondary search of the Black Wolfpack.  (Docket No. 384 at p. 72.)  Law enforcement agents removed the cabin table from the floor, uncovering a "secret compartment."  Id. at p. 79.

Forvour seized 56 packages of cocaine from this makeshift space. Id. at p. 83. The packages of cocaine displayed insignia similar to the crown and Mercedes Benz symbols from the 2017 trip to St. Thomas. Id. at p. 88.

Resto testified extensively at trial, implicating Martínez by detailing her role in the conspiracy. (Docket Nos. 386, 387 and 395.) The jury also heard testimony from federal agents regarding the interdiction, the defendants' arrest, and seizure of the cocaine. (Docket Nos. 383—386.) FBI agent Christian Somersall extracted data from Martínez's phone, obtaining incriminating text messages and photos. (Docket No. 386 at pp. 21—95.)

## II. Rule 29 Legal Standard

A court may set aside a jury's guilty verdict and enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. See Fed. R. Crim. P. 29. In reviewing a motion for judgment of acquittal, a court must consider the evidence "in the light most favorable to the prosecution" and determine whether the "body of proof, as a whole, has sufficient bite to ground a reasoned conclusion that the government proved each of the elements of the charged crime beyond a reasonable doubt." United States v. Lara, 181 F.3d 183, 200 (1st Cir. 1999) (citations omitted).

Rule 29 motions require a court to "take into account all evidence, both direct and circumstantial, and [to] resolve evidentiary conflicts and credibility disputes in favor of the jury's verdict." United States v. Valerio, 676 F.3d 237, 244 (1st Cir. 2012). The First Circuit Court of Appeals has called this sufficiency of evidence challenge "a tough sell." United States v. Polanco, 634 F.3d 39, 45 (1st Cir. 2011); United States v. Hatch, 434 F.3d 1, 4 (1st Cir. 2006) (referring to the sufficiency of evidence burden as a "daunting hurdle").

While the sufficiency of the evidence is at the heart of the Rule 29 inquiry, deference to the jury's verdict controls the Court's analysis. To uphold the jury's guilty verdict, the Court need only determine that the conviction "finds support in a plausible rendition of the record." United States v. Shaw, 670 F.3d 360, 362 (1st Cir. 2012). Ultimately, Martínez must establish that "the evidence is so scant that a rational factfinder could not conclude that the government proved all the essential elements of the charged crime beyond a reasonable doubt." United States v. Vázquez-Soto, 939 F.3d 365, 371 (1st Cir. 2019).

**A. Conspiracy**

In drug conspiracy prosecutions, the United States must prove the following elements beyond a reasonable doubt: (1) "the existence of a conspiracy," (2) "knowledge of the conspiracy," and

Criminal No. 18-066 [3] (FAB)                                              12

(3) "voluntary participation in the conspiracy." United States v. Monserrate-Valentín, 729 F.3d 31, 41 (1st Cir. 2013); United States v. Medina-Martínez, 396 F.3d 1, 5 (1st Cir. 2005) ("The essence of the crime is the conspirator's agreement to act in concert to import, possess and distribute illegal drugs."). The United States need not show that each co-conspirator participated in every action performed in furtherance of the conspiracy. United States v. Ofray-Campos, 534 F.3d 1, 33 (1st Cir. 2008) (citation omitted). Essentially, "[under] the federal drug conspiracy statute, the criminal agreement itself is the *actus reus*." United States v. Obiora, 910 F.3d 555, 556 (1st Cir. 2018) (citing United States v. Shabanai, 513 U.S. 10, 16 (1994)).

**III. Discussion**

Martínez argues that "[no] evidence, neither direct nor circumstantial, was presented to prove beyond a reasonable doubt that she willfully joined the conspiracies." (Docket No. 442 at p. 3.) The Court disagrees.

   **A.   The Evidence is Sufficient to Sustain Martínez's Conviction for Conspiracy to Import and Distribute Cocaine**

Martínez sets forth a fragmented rendition of the evidence and evinces a misguided understanding of the law. She argues that a judgment of acquittal is warranted because of the "twelve government witnesses, only one, [Resto], mentioned knowing

Criminal No. 18-066 [3] (FAB)                                        13

Ms. Martínez." (Docket No. 442 at p. 5.)  The First Circuit Court of Appeals has held, however, that "the uncorroborated testimony of a cooperating accomplice may sustain a conviction so long as that testimony is not facially incredible." United States v. Torres-Galindo, 206 F.3d 136, 139-40 (1st Cir. 2000); United States v. Santos-Rivera, 726 F.3d 17, 24 (1st Cir. 2013) ("We have previously upheld drug conspiracy and aiding and abetting convictions where the evidence tying the defendant to the conspiracy was provided primarily by the testimony of a single co-conspirator who became a paid government informant.") (collecting cases).  Credibility assessments are within the province of the jury. United States v. Santos-Soto, 799 F.3d 49, 57 (1st Cir. 2015) ("We do not assess the credibility of a witness, as that is the role reserved for the jury."). The Court is "not a thirteenth juror, much less is he a super-juror whose views of credibility could override the jury's verdict." United States v. Freeman, 208 F.3d 332, 343 (1st Cir. 2000) (citation and internal quotation omitted).

   Be that as it may, the United States presented ample evidence to sustain the jury's verdict.  The trial record includes evidence that corroborates Resto's testimony, including photos of: (1) Maximiliano, Martínez, and Andino with La Grandota at her apartment, (2) Martínez, Andino and Maximiliano on a vessel, and

Criminal No. 18-066 [3] (FAB)                                           14

(3) Martínez and Andino on a vessel with an ice-cooler. (Docket Nos. 387 at pp. 42, 46, 75 and 76.) The jury also observed a photo extracted from Martínez's phone showing kilograms of cocaine on tile similar to the floor at La Grandota's apartment. (Docket No. 386 at p. 43.) Additionally, hours before her arrest, Martínez exchanged the following text-message conversation with a person referred to as "Mi Puzz." Id. at p. 90.

> **Mi Puzz**: What are you doing so active at this timeeee [*sic*]
>
> **Martínez**: Hahahhaa. Working until Sunday.
>
> **Mi Puzz**: Working where at this time[?]
>
> **Martínez**: Where I told you last time I was going to work[.] With those people
>
> **Mi Puzz**: Ohh so you are not going to tobacco dis week[.] They gonna [*sic*] kill u
>
> **Martínez**: Hahahhahahahah This is more Than tobaco [*sic*]

Martínez also exchanged text messages with an unknown person, stating: "not in pr Im [*sic*] rich mofo." Id. at p. 92.

　　　　Martínez argues that "no proof was presented that showed [she] willfully [joined] in any conspiracy." (Docket No. 442 at p. 5.) She relies extensively on United States v. Pérez-Meléndez. Id. at pp. 6-7 (citing 599 F.3d 31 (1st Cir. 2010). The First Circuit Court of Appeals vacated the defendants' conviction because the evidence "did not adequately support the inference

Criminal No. 18-066 [3] (FAB)                                      15

that [they] either actually knew about or were willfully blind to the controlled substances they were transporting within the . . . reams of paper." Id. at 41. The Pérez-Meléndez court emphasized the lack of evidence demonstrating that the defendants knowingly transported controlled substances as opposed to other illicit materials *i.e.* weapons and Cuban cigars. Id. at 45. In that case, the defendants drove a "common vehicle unequipped with weaponry or sophisticated technology." Id. The United States presented no evidence that the defendants hid cocaine in reams of paper, nor did the confidential source identify the defendants to federal law enforcement agents. Id.

In contrast to the truck in Pérez-Meléndez, the Black Wolfpack was a sophisticated vessel. The hidden compartment below the cabin floor completely concealed the cocaine, requiring FBI agents to conduct a secondary search after the defendants' arrest. The text messages set by Martínez are probative of her criminal intent. She understood that the "work" in St. Thomas concerned more than "tobaco" [*sic*], and assessed the risk associated with smuggling cocaine as evidence by the news article she shared with Andino. The cooperating witness not only identified Martínez, but also provided a detailed account of her participation in the conspiracy. Consequently, Pérez-Meléndez is distinguishable and lends no support to the Rule 29 motion.

Because evidence presented at trial sufficed to sustain a finding of guilty beyond a reasonable doubt, Martínez's motion for judgment of acquittal must be **denied**.

**IV. Conclusion**

For the reasons set forth above, Martínez's motion for judgment of acquittal is **DENIED**.  (Docket No. 442.)

**IT IS SO ORDERED**.

San Juan, Puerto Rico, April 20, 2020.

s/ Francisco A. Besosa
FRANCISCO A. BESOSA
UNITED STATES DISTRICT JUDGE