```
        IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF PUERTO RICO
```

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    **Plaintiff**,<br><br>              v.<br><br>KATERIN MARTÍNEZ-ALBERTO [3],<br><br>    **Defendant**. | **Criminal No.** 18-066 (FAB) |

**OPINION AND ORDER**

BESOSA, District Judge.

Before the Court is defendant Katerin Martínez-Alberto ("Martínez")'s motion for an evidentiary hearing and a downward adjustment pursuant to the statutory safety valve, 18 U.S.C. section 3553(f) ("section 3553(f)"). (Docket No. 533.) For the reasons set forth below, Martínez's motion is **DENIED**.

**I.  Background**

A grand jury returned a two-count second superseding indictment on August 14, 2019, charging Martínez, Maximiliano Fígaro-Benjamín ("Maximiliano"), Emiliano Fígaro-Benjamín ("Emiliano"), and Alexandria Andino-Rodríguez ("Andino") (collectively, "defendants") with conspiracy to possess with intent to distribute at least five kilograms of cocaine in violation of 21 U.S.C. sections 846, 841(a)(1) and 841(b)(1)(A) (count one), and conspiracy to import a controlled substance into

Criminal No. 18-066 [3] (FAB)                                          2

the customs territory of the United States in violation of 21 U.S.C. sections 952(a), 960(a)(1) and (b)(1)(B) (count two). (Docket No. 316.)[1]

Martínez and Andino stood trial in September of 2019. (Docket Nos. 367, 370, 372, 379, 391, 393 & 399.) The jury found them guilty on both counts. (Docket Nos. 402 and 403.) After the trial, defense counsel, Assistant United States Attorneys, and law enforcement agents met with Martínez for a safety valve debriefing. (Docket Nos. 473 & 487.) Martínez requests that the Court conduct an evidentiary hearing to determine whether she satisfied the criteria set forth in section 3553(f). (Docket No. 533.) She also requests that the Court impose a sentence pursuant to the United States Sentencing Guidelines, "regardless of any statutory minimum term of imprisonment." Id. at p. 2. The United States responded. (Docket No. 546.) The parties filed a reply and a surreply with leave of the Court. (Docket Nos. 555 & 563.)

---

[1] On February 1, 2018, the grand jury initially charged Maximiliano, Emiliano, Martínez, and Andino with conspiring to import and distribute cocaine. (Docket No. 8.) The superseding indictment named two additional defendants, Bernardo Coplin-Benjamín ("Coplin") and José Resto-Miranda ("Resto"). (Docket No. 123.) Coplin and Resto pled guilty on August 5, 2019 and August 12, 2019, respectively. (Docket Nos. 277 and 299). Maximiliano and Emiliano pled guilty on August 18, 2019. (Docket No. 363.)

## II. The Safety Valve

Congress enacted section 3553(f) pursuant to the Mandatory Minimum Sentencing Reform Act of 1994.  18 U.S.C. § 3553(f).  In enacting section 3553(f), Congress intended to:

> permit a narrow class of defendants, those who are the least culpable participants in such offenses, to receive strictly regulated reductions in prison sentences for mitigating factors currently recognized under the federal sentencing guidelines.

H.R. No. 103-460 (1994).  This statute, referred to as the "safety valve," serves to "mitigate the harsh effect of mandatory minimum sentences on first-time, low-level offenders in drug trafficking schemes."  United States v. Padilla-Colón, 578 F.3d 23, 30 (1st Cir. 2009) (internal citation and quotation omitted).

Defendants seeking to avail themselves of the safety valve must satisfy five requirements.  18 U.S.C. § 3553(f).  Martínez's motion for an evidentiary hearing concerns only the fifth requirement.  This provision states that:

> not later than the time of the sentencing hearing, [the defendant must provide] to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

Criminal No. 18-066 [3] (FAB)                                          4

18 U.S.C. § 3553(f)(5).  Satisfaction of every requirement is a precondition for the Court to disregard the applicable mandatory minimum sentence.  See, e.g., United States v. Matos, 328 F.3d 34, 44 (1st Cir. 2003) ("Congress designed the safety valve statute, 18 U.S.C. § 3553(f), with the view that a defendant who satisfies the first four prongs of the statute must prove himself deserving of the safety valve by providing true and complete information to the government prior to the commencement of his sentencing hearing").  The First Circuit Court of Appeals has held that "nothing short of truthful and complete disclosure will suffice." Id. at 38.  The Court may invoke the safety valve only if Martínez engaged in "straight talk; equivocations, half-truths, and veiled allusions will not do."  Id.; United States v. Márquez, 280 F.3d 19, 23 (1st Cir. 2002) ("Full disclosure is the price that Congress has attached to the relief under the [safety valve] statute.") (citation and quotation omitted).

Martínez shoulders the burden of establishing that the safety valve is applicable.  United States v. Richardson, 225 F.3d 46, 53 (1st Cir. 2002).  The Court must render factual findings concerning each requirement before determining whether to disregard the mandatory minimum sentence.  United States v. Harakaly, 734 F.3d 88, 98 (1st Cir. 2013); see, e.g., United States v. Miranda-Santiago, 96 F.3d 517, 529 (1st Cir. 1996) (holding that the

"district court's bare conclusion that [the defendant] did not 'cooperate fully,' absent either specific findings or easily recognizable support in the record, cannot be enough the thwart her effort to avoid imposition of a mandatory minimum sentence"). Whether Martínez is eligible for safety valve relief is subject to the sound discretion of the district court. Matos, 328 F.3d at 42 ("Our case law gives trial judges broad discretion to find safety valve eligibility in spite of government opposition, unintentional bevues, immaterial omissions, or bona fide misunderstandings."); United States v. Montañez, 82 F.3d 520, 523 (1st Cir. 1996) (holding that the "Government is perfectly free to point out the suspicious omissions [in a safety valve proffer] at sentencing, and the district court is entitled to make a common sense judgment").

### III. Martínez Failed to Disclose the Extent of her Participation in the Drug Trafficking Conspiracy

Martínez contends that there "is no specific information that the government alleges [she] has and has failed to provide." (Docket No. 533 at p. 5.)  The United States need not, however, persuade the Court that Martínez omitted or concealed information. In United States v. Márquez, the district court imposed a mandatory minimum sentence because the defendant provided false statements to the United States during the safety valve proffer.  280 F.3d at

24. The Márquez court affirmed the sentence, rejecting the defendant's contention that section 3553(f) "requires a [trial] court to premise any repudiation of the safety valve proffer on 'objective' rebuttal evidence." Id. The First Circuit Court of Appeals held that after a defendant "credibly establishes that she has provided all information," the United States cannot stymie application of the safety valve by "simply saying 'we don't believe the defendant.'" Id. (citing Miranda-Santiago, 96 F.3d at 529 (vacating the defendant's sentence because the "government did not rebut a facially plausible tale of limited involvement by pointing to information [he] must have known")).

Unfortunately for Martínez, her proffer is not credible. Withholding information from the United States disqualifies her from receiving a more lenient sentence despite her minimal criminal history and the non-violent nature of the offense. The safety valve debriefing is fraught with omissions and falsehoods.

**A. The Purported Lack of Knowledge**

Law enforcement agents memorialized the safety valve debriefing in a Federal Bureau of Investigation 302 form ("302 form"). (Docket No. 546, Ex. 1.) Martínez argues that the 302 form is incomplete. This document allegedly omits the following statement regarding the summer 2017 trip to St. Thomas:

> when [the defendants] returned to Puerto Rico, she noticed empty black bags in the boat; she asked Resto about them but said he [*sic*] was taking things out of the bathroom . . . she found this odd and this is what triggered her suspicion of trafficking, but she had no confirmation as she did not see nor deal with drugs.

(Docket No. 555 at p. 2.)  Although the 302 form does not refer to the black bags, it states that "she never saw drugs nor was there any mention of drugs."  (Docket No. 456, Ex. 1 at p. 1.)

The record belies the statements recorded in the 302 form and the omitted "black bag" incident.  Resto testified extensively at trial, implicating Martínez by detailing her role in the conspiracy.  (Docket Nos. 386, 387 & 395.)  He recruited Martínez to join the conspiracy, disclosing "what [the defendants] wanted to do, and that [they] needed women to come in and be like fillers."  (Docket No. 386 at p. 188.)  She harbored no doubt about the purpose of the conspiracy:  Resto explicitly informed Martínez that "they were going to . . . St. Thomas to pick up cocaine and bring it back to Puerto Rico."  Id. at p. 191.

That she suspected the black bags might contain cocaine is inconsistent with evidence demonstrating that Martínez knowingly

Criminal No. 18-066 [3] (FAB)                                                8

participated in the drug-trafficking conspiracy.[2]  The second superseding indictment alleges that the conspiracy "[began] on a date unknown, but not later than 2017, and continued until a date unknown but not earlier than January 27, 2018."  (Docket No. 316 at pp. 1-2.)  The jury determined beyond a reasonable doubt that she knew about and agreed to import cocaine in 2017, not that she merely "suspected" the defendants of importing controlled substances.

**B. The November 4, 2017 Trip to St. Thomas**

Martínez provided the United States with information in piecemeal fashion, admitting involvement in the drug trafficking conspiracy only after law enforcement agents presented her with incriminating evidence.  For instance, Martínez first claimed that "she only visited St. Thomas" on the Black Wolfpack in January of 2018. (Docket No. 546, Ex. 1 at p. 2.)  Law enforcement agents then showed her and defense counsel a photo from November 4, 2017,

---

[2] Martínez argues that the 302 form "should not be considered" because it omits "many of [her] statements, includes the agent's observations regarding her demeanor, and describes defense counsel's statements and behavior during the interview inaccurately and without context.  (Docket No. 555 at pp. 8-9.)  The Federal Rules of Evidence do not apply at sentencing proceedings.  United States v. Robinson, 144 F.3d 104, 108 (1st Cir. 2003). This Court "has broad discretion to accept even hearsay evidence at sentencing so long as the court concludes, with proper support, that the information has sufficient indicia of trustworthiness to warrant a finding of probably accuracy."  United States v. Riccio, 529 F.3d 40, 47 (1st Cir. 2008) (citation omitted).  The substantive inconsistencies between the safety valve statements and the trial evidence precludes a downward adjustment, not Martínez's demeanor or defense counsel's purported behavior.  Martínez does not challenge the veracity of the 302 form. Accordingly, the 302 form bears sufficient indicia of reliability, and the Court may rely on it.

depicting Martínez standing aboard the Black Wolfpack. Id. Again, she denied traveling to St. Thomas on this date, averring that the photo "was from a trip to Palomino." Id. Martínez admitted "to being in St. Thomas" on November 4, 2017 only after viewing marina records corresponding to this trip. Id.

Martínez's attempt to evade full disclosure is perplexing. Because the photo and marina records were admitted as evidence at trial, Martínez cannot feign surprise or profess confusion regarding the November 4, 2017 trip to St. Thomas. (Gov't Exs. 16, 22 & 111.) In fact, Martínez's memory improved significantly after a ten-minute break at the safety valve debriefing. She subsequently recalled that on November 4, 2017 the defendants stayed at the same hotel, drove in a gold Toyota-Corolla taxi, and visited the Hala Hala night club. (Docket No. 546, Ex. 1 at p. 2.) Martínez continued to maintain, however, that she "didn't know there were drugs on the boat." Id.

On the day before the November 4, 2017 trip, Martínez and Andino discussed their plans. (Gov't Exh. 90-1.) This conversation included the following exchange:

> **Andino**: Mami we are leaving tomorrow early Get ready
>
> **Martínez**: Ok Were [*sic*] ready
>
> **Andino**: Okk
>
> **Martínez**: Hahaha

Id. The next day, Martínez's phone captured a photo of cocaine on the floor of an apartment. (Gov't Ex. 88-1.) On November 6, 2017, Martínez forwarded a news article to Andino entitled "Two Women Arrested with 14 Kilos of Cocaine." (Gov't Ex. 90-1.)

At the safety valve debriefing, Martínez claimed that Maximiliano borrowed her phone and took a picture of the cocaine without her knowledge. (Docket No. 546, Ex. 1 at p. 2.) She allegedly learned of the photo a week later, but did not delete this image from her phone. Id. The Court finds that this assertion is suspect, particularly because overwhelming evidence suggests that Martínez was keenly aware of the drug trafficking conspiracy. That Martínez shared a news article detailing a similar criminal scheme evinces a consciousness of guilt and fear of apprehension.

**C. The November 19, 2017 Trip to St. Thomas**

Martínez did not "remember" a photo from November 19, 2017 of herself inside a St. Thomas apartment. (Docket No. 546, Ex. 1 at p. 3.) She suggested that this photo is from a previous trip

to St. Thomas. Id. Once more, marina records demonstrated that the Black Wolfpack docked in St. Thomas on that date. Id.; Gov't Ex. 16. Moreover, data extracted from Maximiliano's phone indicated that the photo Martínez could not identify was, in fact, created on November 19, 2017. Id.; Docket No. 387 at p. 42. The Court finds it incredible that Martínez could not recall any information pertaining to the November 19, 2017 trip to St. Thomas.

**D. The January 27, 2018 Trip to St. Thomas**

Martínez informed the United States that she "only went on the January 27, 2018 trip to sleep with clients, and nothing else." (Docket No. 546, Ex. 1 at p. 4.) Based on the evidence presented at trial, the prostitution theory is a pretext for the drug-trafficking conspiracy. She reiterated that she "was never paid to smuggle drugs. And no one ever spoke of trafficking drugs abroad the Black Wolfpack." Id. Martínez stated that "she was never offered money to go with [Maximiliano, Resto and Andino]" to St. Thomas. (Docket No. 546, Ex. 1 at p. 1.) Resto testified, however, that he offered Andino and Martínez $3,000 each in 2017 if "the [summer] trip was successful." (Docket No. 386 at p. 189.)

Law enforcement agents removed 56 packages of cocaine from a hidden compartment on the Black Wolfpack. (Docket No. 384 at p. 83.) Yet, Martínez only "suspected [the defendants] were moving drugs on the January 27, 2018 trip." (Docket No. 546, Ex. 1 at p.

Criminal No. 18-066 [3] (FAB)                                    12

3.)  Hours before her arrest, Martínez participated in the following text-message conversation with a person named, "Mi Puzz."  (Docket No. 386 at p. 90.)

> **Mi Puzz**: What are you doing so active at this timeeee [*sic*]
>
> **Martínez**: Hahahhaa.  Working until Sunday.
>
> **Mi Puzz**: Working where at this time[?]
>
> **Martínez**: Where I told you last time I was going to work[.]  With those people
>
> **Mi Puzz**: Ohh so you are not going to tobacco dis week[.] They gonna [*sic*] kill u
>
> **Martínez**: Hahahhahahahah This is more Than tobaco [*sic*]

Id. at p. 92.  The "more than tobacco" statement alludes to cocaine, not to prostitution.  Martínez also exchanged text messages with an unknown person, stating: "not in pr Im [*sic*] rich mofo."  Id. at p. 92.  Martínez is "rich" because she agreed to traffic cocaine for thousands of dollars.  The persistent refusal to acknowledge her involvement is fatal to Martínez's safety valve request.

### E. The Gran Via Omission

Martínez informed the United States that she "never spoke to GRAN VIA and never saw him."  (Docket No. 546, Ex. 1 at p. 4.) According to Martínez, she first learned of this person on January 27, 2018, when Maximiliano referred to Gran Via as "the guy they

Criminal No. 18-066 [3] (FAB)                                          13

picked up the drugs from in St. Thomas." Id.  Martínez alleged that she "[didn't] have [Gran Via's] contact information." Id.

Law enforcement agents then showed defense counsel a text conversation between Martínez and Gran Via. Id. The United States previously extracted this conversation from Martínez's cellular phone. Id. The conversation occurred in November of 2017, months before Martínez allegedly first heard Maximiliano refer to Gran Via. Id. Moreover, the phone number detected on Martínez's phone "belong[ed] to the same Gran Via that [Martínez] stated she never met, never spoke with, and had no contact information for." Id. When confronted with this discrepancy, Martínez explained that the contact information for Gran Via on her phone is "another" Gran Via, a client in St. Thomas. Id. Martínez's explanation is unconvincing. Her failed attempt to reconcile her initial statements with the evidence extracted from her phone demonstrates a lack of candor.

The contradictions presented by Martínez defy common sense. Her misstatements are not inadvertent, "good faith [omissions] to disclose information [she] could not imagine was relevant." United States v. Feliz, 453 F.3d 33, 36—37 (1st Cir. 2006) (affirming denial of safety valve relief because "there were three major drug transactions at issue in [the defendant's] case, and [he] did not disclose his involvement in the second of these in his initial

proffer"). Martínez minimized her participation in the conspiracy to her detriment. Accordingly, she is ineligible for safety valve relief pursuant to section 3553(f).

**IV. The Evidentiary Hearing**

Martínez "has no absolute or presumptive right to insist that the sentencing court take testimony on every fact germane to sentencing." United States v. Rodríguez, 336 F.3d 67, 72 (1st Cir. 2003). Trial courts possess broad discretion regarding requests for evidentiary hearings. United States v. Colón-Muñoz, 318 F.3d 348, 358 (1st Cir. 2003). The Court considers the "totality of the circumstances and assess[es] the likely utility of a hearing in that light." Rodríguez, 336 F.3d at 70 (citation omitted).

The circumstances of this case do not warrant an evidentiary hearing. That Martínez concealed the degree of her knowledge of and participation in the drug-trafficking conspiracy is beyond dispute. Consequently, the motion for an evidentiary hearing is **DENIED**. See United States v. Montes, 151 Fed. Appx. 846, 856 (11th Cir. Sept. 27, 2005) (holding that the district court "did not plainly err in not conducting an evidentiary hearing before deciding not to sentence Montes under the safety-valve provisions" because "[the defendant] failed to submit any evidence from which the court could infer that he either shared with the government

Criminal No. 18-066 [3] (FAB) 15

all the information he had about the offense conduct and related activities, or that he had no such information").

## V. Conclusion

For the reasons set forth above, Martínez's motion for an evidentiary hearing and a downward adjustment pursuant to section 3553(f) is **DENIED**. (Docket No. 533.)

**IT IS SO ORDERED.**

San Juan, Puerto Rico, November 2, 2020.

<u>s/ Francisco A. Besosa</u>
FRANCISCO A. BESOSA
UNITED STATES DISTRICT JUDGE